AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America ) | |
| v. ) | |
| ) | Case No. 3:26-mj-70231 MAG |
| FRANKLIN JAIR LOPEZ ) | |
| ) | |
| ) | |
| ) | |
| *Defendant(s)* | |

**FILED**
Mar 04 2026
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  November 18, 2025-March 3, 2026  in the county of  San Mateo & San Francisco  in the

Northern  District of  California , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | engaging in the business of dealing in firearms without a Federal Firearms License (felony) |
| 18 U.S.C. § 2 | aiding and abetting |

This criminal complaint is based on these facts:

See attached Affidavit in Support of Criminal Complaint by ATF SA Julian Watts

☑ Continued on the attached sheet.

/s/
*Complainant's signature*

Approved as to form    /s/
AUSA Daniel N. Kassabian

Julian Watts, ATF Special Agent
*Printed name and title*

Sworn to before me by telephone.

Date: 03/04/2026

*Judge's signature*

City and state:  San Francisco, California

Hon. Lisa J. Cisneros, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AN ARREST WARRANT AND CRIMINAL COMPLAINT

I, Julian Watts, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, having been duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for an arrest warrant and criminal complaint charging **FRANKLIN JAIR LOPEZ** ("**LOPEZ**") with 18 U.S.C. § 922(a)(1)(A) (engaging in the business of dealing in firearms without a Federal Firearms License), and 18 U.S.C. § 2 (aiding and abetting), occurring between November 18, 2025 and March 3, 2026, in the Northern District of California.

## SOURCES OF INFORMATION

2. The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents, officers, and witnesses. Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

3. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint and arrest warrant, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause for a criminal complaint and arrest warrant. My understanding of the facts and circumstances of the case may evolve as the investigation continues.

## AFFIANT BACKGROUND

4. I am an "investigative or law enforcement officer of the United States" within the

meaning of 18 U.S.C. § 3051, that is, a Special Agent of the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), who is empowered by law to conduct investigations of, serve warrants and subpoenas for, and to make arrests for, any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony offenses; particularly those enumerated in Title 18, United States Code, Chapter 44.

5.     I am currently employed by the ATF as a Special Agent. I have been so employed since May 2022, and I am presently assigned to the San Francisco Metro Group located in San Francisco, California.

6.     I am a graduate of the Federal Law Enforcement Training Center ("FLETC"), graduating with both their Criminal Investigative Training Program and ATF Special Agent Basic Training certifications. While at FLETC, I received a total of 27 weeks of training and conducted training investigations related to the enforcement of the laws and regulations related to the illegal trafficking of firearms and explosives, as well as arsons that meet the criteria of federal crime.

7.     I am a graduate of the New York State Peace Officer Academy at the New York City Department of Investigation, and a former New York State Peace Officer. I served in this role for approximately three years, during which I maintained and investigated a full case load while performing complex field operations, including spending time as an undercover investigator.

8.     I have also received a Bachelor of Arts in Political Science, with a focus and departmental honors in Legal Studies, from Manhattanville College in Purchase, New York.

9.     During my employment as an ATF Special Agent, I have participated in a variety of firearms trafficking-related enforcement actions in a supporting role. I have participated in debriefs of confidential sources and witnesses who had personal knowledge regarding firearms trafficking participants. In addition, I have discussed with numerous law enforcement officers and confidential sources the methods and practices used by firearms traffickers. I have also

participated in many aspects of firearms trafficking investigations, including physical surveillance and enforcement operations. Moreover, I have assisted in the execution of federal search and arrest warrants related to illegal activities involving firearms trafficking and the illegal possession of firearms that resulted in the arrest of suspects and seizure of the illegally trafficked firearms.

10. During my time at the New York City Department of Investigation, I was an active participant in the execution of two federal wire and electronic interception (wiretap) applications in furtherance of organized crime and money laundering investigations. I have monitored and listened to intercepts, reviewed transcripts and line sheets, and conducted electronic and physical surveillance.

11. Prior to my time at the New York City Department of Investigation, I was a Trial Preparation Assistant at the New York County District Attorney's Office for approximately one year.

12. Through my involvement in discussions with other law enforcement personnel, classroom and field training, discussions with confidential informants, and arrest interviews of defendants involved in both violent and white-collar crime, I have become familiar with the methods used by traffickers to transport, safeguard, and distribute items illegally, and the methods used by traffickers to collect, transport, safeguard, remit, and/or launder illegal proceeds. I have worked with other experienced agents, law enforcement officers, and prosecutors on cases that use electronic surveillance to investigate firearms trafficking and money laundering across multiple jurisdictions within the United States. I am also aware that firearms traffickers will use their cellphones to advertise, discuss, and coordinate the trafficking of firearms.

13. My role in this investigation, combined with my training and experience, information I have learned from other ATF agents and other law enforcement agencies or officials, and my review of records and reports relating to the investigation form the basis for the opinions I set forth in this Affidavit. Unless otherwise noted, wherever in this Affidavit that I

assert that a statement was made, the information was provided by another ATF agent, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

## APPLICABLE STATUTES

14. 18 U.S.C. § 922(a)(1)(A) makes is a crime to engage in the business of dealing in firearms without a Federal Firearms License.

15. 18 U.S.C. § 2(a) states that: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

16. 18 U.S.C. § 2(b) states that: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

## STATEMENT OF PROBABLE CAUSE

### Overview

17. Beginning on or around May 2025, ATF, the Drug Enforcement Administration, Daly City Police Department (DCPD), California Highway Patrol, and the San Mateo County Gang Intelligence Unit began collaborating on an investigation into firearms and narcotics trafficking in the San Francisco Bay Area.

18. Within the last four months, as described further below, law enforcement agents have purchased a total of six trafficked firearms from Kebin Isaac GONZALESCHAVAC ("GONZALESCHAVAC") on three separate occasions, using an undercover officer ("UC") to conduct the controlled purchases. Each time, law enforcement agents, in an undercover capacity, coordinated the controlled purchase via cellular communications to the phone number ending 8654 associated with GONZALESCHAVAC. Using the phone number ending 8654,

GONZALESCHAVAC sent messages with numerous photographs and videos of various firearms such as pistols, rifles, and automatic firearms he had for sale, including the ones purchased by the UC. On February 25, 2026, GONZALESCHAVAC was indicted for violating 18 U.S.C. § 922(a)(1)(A) and 18 U.S.C. § 922(o) (possession of a machine gun) in the Northern District of California, case no. 3:26-CR-00088-CRB.

19. As described further below, during each of the three controlled purchases from GONZALEZCHAVAC, law enforcement witnessed **LOPEZ** assisting GONZALEZCHAVAC by engaging in countersurveillance, in one instance providing the bag and case containing the firearms that were then handed GONZALEZCHAVAC to the undercover officer, and in another instance being handed the cash for the firearms purchase that GONZALEZCHAVAC had been given by the undercover officer moments earlier.

20. **LOPEZ** was arrested on March 3, 2026 (today) during the execution of federal search warrants, including the search of **LOPEZ**'s residence. In his residence, in a bedroom identified as **LOPEZ**'s, law enforcement agents located two additional firearms that matched the photographs of firearms that GONZALEZCHAVAC had intended to sell to the UC officer today per and their communications using the number ending 8654 associated with GONZALESCHAVAC. During his arrest, **LOPEZ** was identified as the person assisting GONZALEZCHAVAC during the three controlled buys.

21. Previously, law enforcement agents had misidentified, through their visual surveillance and comparison to booking photos, the person assisting GONZALEZCHAVAC as **LOPEZ**'s brother, who is one year older. Following **LOPEZ**'s arrest on March 3, 2026, law enforcement agents who saw the person assisting GONZALEZCHAVAC by engaging in countersurveillance—in particular, DCPD Officers Ronaldo Barba, Noah Serbin, and Corey Shoopman—saw **LOPEZ** today and confirmed that LOPEZ was the person they had seen assisting GONZALEZCHAVAC during two of the firearm controlled buys with GONZALEZCHAVAC. Also following **LOPEZ**'s arrest, law enforcement agents learned that **LOPEZ**'s older brother, whom they had initially misidentified as the participant in the firearm

5

purchases, was in custody during the three controlled buys.

22. In addition, many of the photos and videos firearms offered for sale via WhatsApp messages by GONZALEZCHAVAC, including ones purchased during the controlled buys, had bed sheets and a patterned rug in their background that matched the bedsheets and pattered rug carpet back in a bedroom identified as **LOPEZ**'s—i.e., those firearms were in **LOPEZ**'s room at the times those photos and videos were taken.

### November 18, 2025 Controlled Purchase

23. On November 18, 2025, there was a controlled purchase from GONZALESCHAVAC, with **LOPEZ** now believed to be assisting—although agents initially misidentified the assisting individual as **LOPEZ**'s older brother. The purchase was conducted by a law enforcement officer acting as a UC, who purchased a fully automatic AR-style pistol in Daly City, California.

24. Prior to the controlled purchase, DCPD Officer Barba, acting in an UC capacity, reached out to GONZALESCHAVAC, who was using the phone number ending 8654, via WhatsApp messaging, to coordinate the purchase of firearms from GONZALESCHAVAC. A date, time, and place were agreed upon.

25. On or about 6:00 p.m. on the date of the controlled purchase, surveillance units observed a gray Ford Fusion bearing California license plate number 7FJS136 park in the parking lot of the predetermined meeting location in Daly City. Surveillance units did not observe the driver exit the Ford Fusion at that time. At approximately 6:30 p.m., surveillance units observed the driver of the Ford Fusion, later identified as GONZALESCHAVAC, exit the car and walk toward the northwest side of the parking area. Surveillance units then observed GONZALESCHAVAC on the phone and he appeared to be looking for someone or flagging someone down in the parking lot.

26. Surveillance units then observed GONZALESCHAVAC return back to his Ford Fusion. Shortly after, surveillance observed a gray Nissan Altima, bearing California license

plate number 6TCP042, parked two spaces from the Ford Fusion. The Nissan Altima was registered to **LOPEZ**'s brother—who agents now know was in custody at that time—and driven by a person believed to be **LOPEZ** based on his presence at other controlled buys, including in the same Nissan Altima at the following controlled buy discussed below. Surveillance units then observed the person driving the Nissan Altima, who was wearing a balaclava face mask so his face could not be made out, exited from the Nissan Altima and spoke just outside of it with GONZALESCHAVAC, who had exited the Ford Fusion at that time.

27. Shortly thereafter, GONZALESCHAVAC met up with the UC at the predetermined location. The UC entered the Ford Fusion and GONZALESCHAVAC sold the UC a fully automatic (as determined later) AR-style pistol in exchange for funds provided by ATF for this investigation. Shortly thereafter, the UC exited the Ford Fusion.

28. Following the deal, GONZALESCHAVAC departed the predetermined location in the Ford Fusion and met back up with the driver of the Nissan Altima, now believed to be **LOPEZ**—i.e., surveillance observed the driver of the Ford Fusion and the driver of the Nissan Altima park near each other and interact after the purchase.

29. In my training and experience, and based on my observations, the driver of the Nissan Altima, believed to be **LOPEZ,** engaged in conduct that was observed during the controlled buy that was consistent with known techniques of countersurveillance used by criminals to assist each other by protecting themselves from other criminals and law enforcement while committing crimes.

30. At the conclusion of the operation, the UC provided ATF agents with the remaining U.S. currency. ATF agents took possession of the purchased AR-style pistol for evidentiary purposes. During a field function test of the purchased AR-style pistol by ATF agents, the firearm presented indicators of being capable of fully automatic fire (i.e. being a machinegun). Subsequent testing of the firearm using live ammunition confirmed that it was fully automatic—i.e., expelled at least two rounds with one pull of the firearm's trigger.

**December 9, 2025 Controlled Purchase**

31. On December 9, 2025, law enforcement agents conducted another controlled purchase from GONZALESCHAVAC. That day, GONZALESCHAVAC, who was again assisted by **LOPEZ**, sold firearms to the same UC as the November 18 controlled buy. Although he initially misidentified the assisting individual as **LOPEZ**'s older brother, DCPD Officer Barba has now confirmed that individual assisting GONZALESCHAVAC that day to be **LOPEZ** after seeing **LOPEZ** during his arrest. More specifically, DCPD Officer Barba has identified **LOPEZ** as the person photographed below, wearing a black jacket with North Face logo:



During the December 9, 2025 controlled buy, the UC purchased two firearms—a privately made AR-style pistol and a Glock 20 (serial no. BKVT297)—at a predetermined location in Daly City.

8

32. Prior to the controlled purchase, DCPD Officers Barba, acting in an UC capacity, reached out to GONZALESCHAVAC, who was using the phone number ending 8654, via WhatsApp messaging, to coordinate the purchase of firearms with GONZALESCHAVAC. A date, time, and place were agreed upon. The following photo of the firearms to be purchased was messaged by GONZALESCHAVAC:



33. On the day of the purchase, before the actual purchase itself, law enforcement mobile surveillance units conducted rolling surveillance of **LOPEZ**—again, at the time believed to be his older brother. At approximately 10:00 am, surveillance personnel located the Nissan Altima, with California license plate number 6TCP042—that law enforcement agents believe was previously driven by **LOPEZ** during the controlled buy on November 18—parked on the 100 block of Brookdale Avenue in San Francisco, California. **LOPEZ** and another individual—who at that time was misidentified as **LOPEZ**—were observed exiting a residence and entering into the Nissan Altima. The other individual with **LOPEZ** was seen carrying a black backpack,

which appeared to be heavy, and an ammunition can[1] into the vehicle the Nissan Altima.

      34.      Law enforcement mobile surveillance units followed the Nissan Altima to a residence on Head Street in San Francisco, which later was determined to be **LOPEZ**'s residence. Around approximately 11:22 am, law enforcement observed **LOPEZ** walk from the Nissan Altima, which was parked on the street, towards the garage of that residence and bring the black backpack and ammunition can into the residence. **LOPEZ** was observed making phone calls and appeared to be texting before walking up a set of stairs towards the front entrance of the residence. **LOPEZ** then walked back down the same set of stairs at the residence, the garage door of which then opened. **LOPEZ** appeared to remove an item from the backseat of his Nissan Altima, hide it in his jacket, and then walk into the residence via the open garage.

      35.      Around the time of 12:55 pm, mobile surveillance units observed **LOPEZ** and the other individual exit the residence at Head Street and enter back into his Nissan Altima. **LOPEZ** was observed carrying a large orange backpack into his Nissan Altima and the other individual was observed carrying a black and gray pistol safe with a key inside the lock of it. Both entered the Nissan Altima with these items and drove away from the residence. Mobile surveillance units then followed the Nissan Altima driven by **LOPEZ** to a location in the same area where the UC and GONZALESCHAVAC agreed to conduct a purchase for firearms. At that location, surveillance observed **LOPEZ** and the other individual meet with GONZALESCHAVAC, who

---

[1] An ammunition can is a distinctive container for holding rounds of ammunition, similar in look to the ones shown below:

was driving his Ford Fusion, with California plate number 7FJS136. At one point, all three of them—i.e., **LOPEZ**, GONZALESCHAVAC, and the other individual—were observed sifting through a backpack while seated in the Nissan Altima. Eventually, GONZALESCHAVAC and the other individual departed in the Ford Fusion to the nearby UC meet location and parked approximately three spaces south of the UC's vehicle.

36. Law enforcement surveillance then observed GONZALESCHAVAC exiting the Ford Fusion, retrieving an orange backpack from the rear passenger seat of the Ford Fusion, and then entering into the UC's vehicle. GONZALESCHAVAC and the UC exchanged a predetermined amount of U.S. currency for the two firearms. GONZALESCHAVAC provided the AR-style pistol inside the orange backpack that agents had seen in **LOPEZ**'s hands earlier that day as the two departed the Head Street residence; GONZALESCHAVAC provided the UC the Glock 20 inside the same gray pistol safe previously observed in the other individual's hands while he was with **LOPEZ** earlier that day, with that gray pistol safe also in the orange backpack when it was provided to the UC.

37. After the exchange, GONZALESCHAVAC was observed placing the money from the UC into his (GONZALESCHAVAC's) front right pocket and, after the controlled buy had been completed, ultimately providing some to the other individual, at the buy's location.

38. After the exchange, all three individuals—**LOPEZ**, GONZALESCHAVAC, and the other individual—reconvened and were observed standing outside talking to one another.

39. Surveillance units then followed **LOPEZ** and the other individual, in the Nissan Altima, back to the residence at Head Street. Other surveillance units followed GONZALESCHAVAC, in the Ford Fusion, to a different location in San Francisco.

### February 12, 2026 Controlled Purchase

40. On February 12, 2026, law enforcement agents conducted another controlled buy from GONZALESCHAVAC, with the assistance of **LOPEZ**, by the same UC as the November 18 and December 9 firearms purchases. Again, although DCPD Officers Barba, who also saw

11

the individual assisting GONZALESCHAVAC that day, initially misidentified the assisting individual as **LOPEZ**'s older brother, DCPD Officer Barba has now confirmed that individual assisting GONZALESCHAVAC that day to be **LOPEZ** after seeing **LOPEZ** during his arrest. GONZALESCHAVAC sold three firearms—a privately manufactured AR-style pistol, privately manufactured Polymer80 pistol, and a Quiet Riot Firearms QRF-15 AR-style pistol (#QRF0236)—to the UC at a predetermined location in Daly City.

41.   Prior to the controlled purchase, DCPD Officer Barba, acting in an UC capacity, reached out to GONZALESCHAVAC, who was using the phone number end 8654, via WhatsApp messaging to coordinate the purchase of the three firearms listed above, which GONZALESCHAVAC had offered to sell previously. A date, time, and place were agreed upon. The following photos of the firearms to be purchased were messaged by GONZALESCHAVAC:



42.   On the day of the purchase, at or around the agreed upon time and location, GONZALESCHAVAC arrived at the location in a 2023 white Kia SUV bearing license plate number 9TUT038 and parked a few parking spots away from the UC's vehicle. At the same time, LOPEZ arrived driving a gray Ford Fusion bearing license plate number 9RYD235 with another individual, believed to be the same individual present during the December 9 controlled buy. The Ford Fusion, with **LOPEZ** and the other individual as the driver and front seat passenger respectively, parked perpendicular to GONZALESCHAVAC's Kia SUV and waited inside the Ford Fusion for the duration of the controlled purchase.

43. GONZALESCHAVAC was observed exiting the Kia SUV with a red Nike duffel bag, walking to the UC's vehicle, and then entering the passenger side of the UC's vehicle. GONZALESCHAVAC and the UC exchanged a predetermined amount of U.S. currency for the three firearms. GONZALESCHAVAC then told the UC that he (GONZALESCHAVAC) had to go give the money he had just received for the firearms to his (GONZALESCHAVAC's) friend. GONZALESCHAVAC was then seen exiting the passenger side of the UC's vehicle, walking over to the Ford Fusion driven by **LOPEZ**, and handing him the money through an open passenger side window. GONZALESCHAVAC then returned and entered into the UC's vehicle for a short conversation with the UC, then completed the meeting, and exited the UC's vehicle for the final time that day. The UC then left the location and returned to a predetermined location.

44. Surveillance units were able to follow GONZALESCHAVAC back to a location in San Francisco. Surveillance followed **LOPEZ** to California highway 101 North but, ultimately, lost track of his vehicle.

45. At the conclusion of the operation, the UC provided ATF agents with the remaining U.S. currency. ATF agents also took possession of the purchased AR-style pistol, QRF-15, and Polymer80 pistol for evidentiary purposes.

### Execution of the Search Warrant At The Residence On Head Street

46. On March 3, 2026 (today), law enforcement agents executed a federal search warrant, no. 3:26-mj-70216 LB signed on February 27, 2026, at **LOPEZ**'s residence on Head Street in San Francisco. This is the same residence on Head Street described above. Inside the residence, agents discovered two additional privately manufactured firearms. One firearm was an AR-style pistol; the other was a short-barreled rifle with fully automatic fire capability—i.e., when test fired for NIBIN testing, the short-barreled rifle functioned as a machine gun.

47. The firearms recovered at this residence were the same two firearms that GONZALESCHAVAC had offered to the UC over the weekend before execution of the search warrant, via WhatsApp messages from the phone number ending in 8654 that included photographs of the firearms. The following is a screenshot of a video of one of the firearms to be purchased that was messaged by GONZALESCHAVAC:



48. When asked, the other residents at the residence at Head Street confirmed the room the firearms were found in was **LOPEZ**'s, and the bed they were found under was his bed. All residents denied having any knowledge that the firearms were there, and stated none of them owned those firearms nor possessed them.

49. The bed in **LOPEZ**'s bedroom had the same bedsheets that were in the background of the photos and/or videos sent by GONZALEZCHAVAC of several firearms that he offered for sale, including in two photos with bedsheets shown above.

50. **LOPEZ**'s bedroom also had the patterned area rug that was in the in the background of the photos and/or videos sent by GONZALEZCHAVAC of several firearms that he offered for sale, including the other photo and the screenshot of the video shown above.

## **CONCLUSION**

51. Based on the information above, there is probable cause to believe that between November 18, 2025 and March 3, 2026, LOPEZ violated 18 U.S.C. § 922(a)(1)(A) (engaging in the business of dealing in firearms without a Federal Firearms License) and 18 U.S.C. § 2 (aiding and abetting) based on his assistance in selling multiple firearms to the UC and apparent readiness to do so again with the firearms found in his bedroom. Accordingly, I respectfully request that the Court issue a criminal complaint and a warrant for his arrest.

/s/
Julian Watts
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 4th day of March 2026. This complaint and warrants are to be filed under seal.

_____
HONORABLE LISA J. CISNEROS
United States Magistrate Judge

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT    ☐ INFORMATION    ☒ INDICTMENT    ☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location:
**NORTHERN DISTRICT OF CALIFORNIA — SAN FRANCISCO DIVISION**

## OFFENSE CHARGED

18 U.S.C. §§ 922(a)(1)(A) and 2– Dealing Firearms Without a License; Aiding and Abetting

☐ Petty    ☐ Minor    ☐ Misdemeanor    ☒ Felony

PENALTY:
- Maximum Imprisonment: 5 years
- Maximum Fine: $250,000
- Maximum Supervised Release: 3 years
- Special Assessment: $100 per count
- Forfeiture

### DEFENDANT - U.S

▶ **FRANKLIN JAIR LOPEZ**

DISTRICT COURT NUMBER:

## PROCEEDING

Name of Complaintant Agency, or Person (& Title, if any): Bureau of Alcohol, Tobacco, Firearms & Explosives

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of: ☐ U.S. ATTORNEY ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form: **CRAIG H. MISSAKIAN**
☒ U.S. Attorney    ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): **DANIEL N. KASSABIAN**

### DEFENDANT

**IS NOT IN CUSTODY**

1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction    ☐ Federal ☒ State

6) ☒ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution: San Mateo County - Maguire Correctional Facility

Has detainer been filed? ☐ Yes    ☒ No    If "Yes" give date filed _____

**DATE OF ARREST** ▶ Month/Day/Year: March 3, 2026

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶ Month/Day/Year: _____

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS: ☐ SUMMONS    ☐ NO PROCESS*    ☒ WARRANT    Bail Amount: No Bail

If Summons, complete following: ☐ Arraignment ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____    Before Judge: _____

Comments: